UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KEVIN KING,                    )
    Plaintiff,             )
                           )
                           )
       v.               )   Civil Action No. 1:11cv300
                           )
MICHAEL ASTRUE,                )
Commissioner of               )
Social Security,              )
    Defendant.             )

MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), Kevin King ("plaintiff")
seeks judicial review of the final decision of the Commissioner
of Social Security ("defendant") denying plaintiff's claim for
disability insurance benefits ("DIB") under Title II of the
Social Security Act ("the Act"), 42 U.S.C. §§ 401-434.
Specifically, plaintiff brings this action to review the
decision of the Commissioner of Social Security that plaintiff
is not disabled and thus not entitled to disability insurance
benefits ("DIB").  The record has been filed, and the case is
now before the Court on cross-motions for summary judgment.

In his Motion for Summary Judgment, plaintiff contends the
Administrative Law Judge's ("ALJ") decision should be reversed
because: (1) the final decision is unsupported by substantial
evidence; (2) the ALJ applied erroneous legal standards in
reaching its final decision; and (3) plaintiff did not receive a

1

full and fair hearing.  By contrast, defendant urges the Court

to uphold the denial of plaintiff's DIB because substantial

evidence exists in the record to support the ALJ's decision that

plaintiff was not disabled within the meaning of the Act, and

because the ALJ applied the correct legal standards in reaching

the decision.

## I.   PROCEEDINGS

On April 25, 2006, plaintiff filed an application for DIB

alleging disability due to chronic fatigue syndrome[1] ("CFS"),

depression, and anxiety beginning April 27, 2003.

(Administrative Record ("R.") 159-64.)  The Commissioner denied

plaintiff's application upon initial review on February 28,

2007, and again upon reconsideration on May 24, 2007.  (Id. at

100-10, 113-15.)

On December 17, 2008, ALJ C.J. Sturek held a hearing on

plaintiff's application.  (Id. at 49-94.)  After further

---

[1] CFS is defined as

> a systemic disorder consisting of a complex of symptoms
> that may vary in incidence, duration, and severity. It is
> characterized in part by prolonged fatigue that lasts 6
> months or more and that results in substantial reduction in
> previous levels of occupational, educational, social, or
> personal activities. In accordance with criteria
> established by the CDC, a physician should make a diagnosis
> of CFS 'only after alternative medical and psychiatric
> causes of chronic fatiguing illness have been excluded.'

Social Security Ruling 99-2P (quoting *Annals of Internal
Medicine*, 121:953-9, 1994).

developing the record and holding a supplemental hearing on July 17, 2009, the ALJ issued a decision on August 20, 2009 finding that plaintiff was not disabled and that plaintiff could perform unskilled light and sedentary work.  (Id. at 8-25.)  Plaintiff requested reconsideration by the Appeals Council.  (Id. at 5-6, 261-67.)  The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Id. at 1-4.)  Pursuant to 42 U.S.C. §405(g), plaintiff exhausted his administrative remedies.

On March 24, 2011, plaintiff filed the instant suit in the Eastern District of Virginia challenging the ALJ's decision. (Dkt. 1.)

## II.   FACTS OF RECORD

**A.   Plaintiff's Personal Background**

Plaintiff was born on July 10, 1961.  (R. 159.)  He graduated college with a B.S. in Biology in 1983, obtained a Masters in Physiology in 1985, and obtained his M.D. in 1989. (Pl's Mem. Supp. Mot. J. Pleadings 4.)  He completed a four-year residency at Saint Vincent's Hospital in New York City from 1989 to 1993.  (Id.)  Between 1993 and 2003 he practiced internal medicine in San Diego, California, New York City, and Miami, Florida, and specialized in the treatment of HIV.  (Id.)  After gradually experiencing anxiety and fatigue, he stopped working in April 2003 and allowed his board certification to lapse.

(Id.)  He began receiving long-term disability benefits of $5,200 per month from a private insurer in August 2003.  (Id. at 17.)

Plaintiff's insured status for DIB expired on December 31, 2009. (R. 12, 14.).  Thus, to qualify for DIB, plaintiff was required to show disability prior to that date. 42 U.S.C. § 423(a)(1)(A),(c)(1)(B); 20 C.F.R. § 404.131.

## B.   Plaintiff's Medical Background

Plaintiff has been diagnosed with "[CFS], a depressive disorder, a generalized anxiety disorder, a somatoform disorder, a cognitive disorder manifested by memory loss, and sleep apnea."  (R. 14.)  A summary of his medical history follows.

## 1.   Kristie Schmidt, M.D.

Dr. Kristie Schmidt treated plaintiff from November 3, 2003 to March 27, 2006.  (Id. at 268-370.)  Plaintiff travelled from Virginia to New York for consultations with Dr. Schmidt roughly once a month between June 2003 until March 2006.  (Id. at 271-303.)  As part of her treatment, Dr. Schmidt referred plaintiff to gastrointestinal and sleep studies.  (Id. at 307.)

A November 3, 2003 sleep study resulted in a diagnosis of excessive daytime sleepiness/tiredness/fatigue, sleep maintenance insomnia, snoring, and anxiety.  (Id. at 370.)  The clinician noted that plaintiff spent the hours before bed reading, watching TV, and surfing the Internet.  (Id. at 369.)

4

A November 4, 2003 colonoscopy at the NYU School of Medicine resulted in a diagnosis of mild diverticulosis and the removal of three small polyps, which were found to be benign. (Id. at 359, 363-66.)

On January 5, 2004, Dr. Schmidt completed a patient questionnaire for plaintiff's private insurer.  (Id. at 305-09.) She noted plaintiff's inability to concentrate or problem-solve for extended periods of time.  (Id. at 306.)  She reported that she had discussed diet and lifestyle management with plaintiff. (Id. at 306.)

In a June 14, 2004 letter, Dr. Schmidt noted that plaintiff's complaints included "profound and overwhelming fatigue, depression, anxiety, memory and concentration difficulties, palpitations, lightheadedness, fever, sore throat, diarrhea, abdominal pain, headaches, insomnia, and low back pain."  (Id. at 289.)  Plaintiff's medications included Nexium, Ibuprofen, Vicodin, Klonipin, Effexor, Toprol, and Bismuth Subsalicylate.  (Id. at 290.)  Dr. Schmidt suggested that his "prognosis for recovery enough to resume work is poor."  (Id. at 290.)

On August 8, 2005, upon plaintiff's request, Dr. Schmidt signed a letter drafted by plaintiff stating that "[i]t is my opinion that he is permanently and totally disabled due to [CFS] and Generalized Anxiety Disorder.  His symptoms are daily and

severe fatigue as well as anxiety that is easily exacerbated."
(Id. at 281.)

Dr. Schmidt referred plaintiff to Anne O'Donnell, M.D., who
completed a sleep latency test at Georgetown University Hospital
in September 2005.  (Id. at 353.)  Dr. O'Donnell diagnosed
plaintiff with obstructive sleep apnea syndrome and recommended
the trial of a home CPAP face mask, as well as other
conservative treatments.  (Id. at 354.)

2.  Steven L. Cohn, M.D.

Dr. Steven Cohn examined plaintiff in February 2006 as part
of an independent medical evaluation for plaintiff's private
long-term disability insurance.  (Id. at 480.)  Plaintiff's
attorney was present during this examination.  (Id. at 481.)

After a review of plaintiff's background and medical
history, as well as a physical exam, Dr. Cohn stated that he
felt "there is no physical reason for disability."  (Id. at
482.)  The only abnormality discovered on exam was tonsillar
enlargement, and all other physical symptoms were deemed
manageable or stable.  (Id.)  Dr. Cohn noted that plaintiff was
"able to get around, travel from Virginia to New York, take the
subway, and walk around."  (Id.)  He also noted that plaintiff
concentrated "very well" during the exam itself.  (Id.)

Dr. Cohn found that plaintiff's complaints appeared to be
psychological or psychiatric in origin.  He stated that

> [i]n theory, [plaintiff] could work part-time (4 hours/day,
> 3 days/week) at another type of relatively sedentary job,
> and if his depression and anxiety improve, he might be able
> to concentrate and focus and return to at least a part-time
> medical position.  It is difficult to state specific
> physical restrictions or mental limitations preventing him
> from functioning as he had in the past as the physical
> findings are unremarkable.

(Id.)  He recommended that plaintiff not work as a physician

until his depression was treated and suggested that plaintiff

undergo psychiatric evaluation.  (Id. at 482-83.)

3.   Susan Levine, M.D.

Plaintiff began seeing Dr. Susan Levine, a CFS specialist,

in March 2006 and through 2008.

In an August 2006 letter to plaintiff's attorneys, Dr.

Levine noted that plaintiff's symptoms included fatigue which

limited his ability to stand for more than 15 to 30 minutes at a

time; various cognitive problems, including "attention and

concentration deficits" and "slowed motor and mental speeds";

and headaches, sore throats, and other aches and pains.  (Id. at

373-74.)  These findings were based on plaintiff's own

complaints, laboratory testing, and neurocognitive testing

performed in July 2006.  (Id. at 374; see infra pp. 12-13.)

Dr. Levine also related that a recent HEENT exam revealed

that plaintiff had bilateral anterior cervical lymph nodes.  (R.

373.)  A SPECT Scan of plaintiff's brain demonstrated "severe,

global, cortical hypoperfusion with heterogeneity – worse on the

left side." (R. 373.)  Plaintiff was using the following medications: Clonazepam, Wellbutrin XL, Nexium, Testim, Toprol XL, and Ibuprofen. (Id. at 372.)  Dr. Levine deemed plaintiff's "prognosis to be poor" and recommended "total and permanent disability." (Id.)

Dr. Levine's notes from 2007 show that plaintiff complained of profound fatigue, inability to concentrate, and sleep disturbances. (Id. at 451-45.)  Attempts at exercise worsened plaintiff's fatigue, although he was able to stand and walk for a half hour at a time. (Id. at 451.)

In May 2007, Dr. Levine wrote a letter stating that plaintiff suffers from CFS and that she deemed him to be permanently disabled. (Id. at 468.)  His reported symptoms at that time included profound exhaustion, low-grade fevers, sore throats, and joint and muscle pain. (Id.)  She stated that plaintiff was unable to perform simple household chores, read or write for more than 15 minutes interrupted, or lift and carry 10 pounds for more than 30 feet. (Id.)

4.  Luc Vinh, M.D.

Dr. Luc Vinh performed a non-examining evaluation in February 2007.[2] (Id. at 410-16.)  Dr. Vinh's report indicates

---

[2] Plaintiff urged the ALJ to discredit the report of Dr. Vinh based on a decision from the United States District Court for the Western District of Virginia. (R. 55-57.)  Because that decision relates to a jurisdiction where plaintiff does not live

that plaintiff could occasionally lift up to twenty pounds, could frequently lift up to ten pounds, and could stand or walk with normal breaks for about six hours in an eight-hour workday. (Id. at 411.)  He could sit with normal breaks for about six hours in an eight-hour workday.  (Id.)  It was Dr. Vinh's opinion that plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (Id. at 412-13.)

Dr. Vinh stated, without much explanation, that his physical assessment of plaintiff was inconsistent with Dr. Levine's opinion that plaintiff was totally disabled.  (Id. at 414-16.)  He also felt that plaintiff had provided inconsistent information about his daily activities.  (Id. at 415.)

5.   Yvonne Evans, Ph.D.

Plaintiff saw Dr. Yvonne Evans for a Mental RFC Assessment in February 2007.  (Id. at 418-21.)  Dr. Evans found that plaintiff had moderate limitations in his ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentrate for extended periods; to perform activities within a schedule and to maintain regular attendance; and to complete a normal workday and workweek without interruptions.  (Id. at 418-19.)

---

and the Social Security Administration had not declared the case applicable in plaintiff's jurisdiction, the ALJ assigned it "limited weight."  (Id. at 18.)

9

After giving consideration to the medical records and opinions of Drs. Krueger, Levine, and Schmidt, Dr. Evans found that plaintiff retained enough cognitive ability for competitive work.  (Id. at 421.)  Although she felt he was unable to return to his previous employment as a physician, she deemed him "capable of at least simple routine non-stressful work, and possibly other work as well if well suited to his particular current abilities and limitations."  (Id.)

6.   Richard B. Krueger, M.D.

Dr. Richard Krueger, a psychiatrist, began treating plaintiff in April 2006.  (Id. at 439-49.)

Dr. Krueger's notes indicate that, in plaintiff's initial interview, "[h]e [was] able to concentrate okay and answer[] all questions appropriately."  (Id. at 443.)  A Beck Depression Inventory indicated that plaintiff suffered from "extreme depression."  (Id.)  Dr. Krueger diagnosed him with major depression, single episode.  (Id. at 444.)

Through May 2007, plaintiff appeared stable, depressed, and somewhat resistant to psychotherapy.  (Id. at 445-49.)  He reported anxiety, sleep disturbances, and low energy.  (Id.)  During this time, plaintiff was taking the medications Wellbutrin, Bupropion, Remeron, Ibuprofen, and Trazodone.  (Id.)

Dr. Krueger felt that plaintiff's depression had not been adequately treated and recommended "aggressive trials of

10

psychopharmacology."  (Id. at 444.)  He also noted that plaintiff's frequent moves between Virginia, Florida, and New York were preventing him from engaging in therapy.  (Id. at 477.)  At one point, Dr. Krueger recommended that plaintiff attempt "some work that could rely on his medical training that did not require contact with people."  (Id. at 449.)

7.   Victor Elion, Ph.D.

Dr. Victor Elion, a board-certified clinical psychologist, performed an independent medical evaluation of plaintiff in May 2006 at the request of plaintiff's private insurance carrier. (Id. at 486-92.)  Plaintiff was able to perform serial 7s with "no difficulty whatsoever," and Dr. Elion found that his memory functions were "intact and logically organized."  (Id. at 489.) He concluded that plaintiff's capabilities were hampered by "significant levels of emotional agitation comprised of … anxiety and depression."  (Id. at 490.)  Dr. Elion diagnosed plaintiff with major depressive disorder and with a secondary diagnosis of anxiety disorder.  (Id. at 491.)

8.   David Fischer, M.D.

Dr. David Fischer performed an independent medical evaluation of plaintiff in June 2006.  (Id. at 495-527.)  Dr. Fischer rated plaintiff's Global Assessment of Functioning ("GAF") Score at 55, indicating that plaintiff has "serious

11

impairment in social and occupational functioning."[3]  (Id. at
519.)  He concurred with earlier physicians' diagnoses of major
depressive disorder, and concluded that plaintiff was not able
to function as a physician in his present condition.  (Id. at
524-25.)

Dr. Fischer also noted that plaintiff "focused on his
physical symptoms and tended to ignore his psychological
symptoms," leaving him "in a more passive condition, waiting for
his physical symptoms to be cured as opposed to the more
proactive approach of dealing with issues in his life."  (Id. at
525.)  In light of plaintiff's lapsed board certifications, Dr.
Fischer found plaintiff's motivation to return to work to be
"low."  (Id. at 516, 525.)

9.  Gudrun Lange, Ph.D.

Upon the recommendation of his attorney, plaintiff
underwent a seven-hour neuropsychological evaluation with Gudrun
Lange, Ph.D. on July 17, 2006.  Plaintiff traveled to Dr.
Lange's offices in Newark, New Jersey via the train from
Manhattan.  (Id. at 237.)  Dr. Lange observed that, after the
seven hour examination, plaintiff appeared "pale, drawn, and
exhausted."  (Id.)

---

[3] Defendant notes that the *Diagnostic and Statistical Manual of
Mental Disorders* ("DSM-IV-TR") considers a GAF between 51 and 60
to indicate only "moderate" difficulty in social or occupational
functioning.  (Def's. Mem. Supp. Mot. Summ. J. 9, n.4.)

Dr. Lange administered a number of tests and found that plaintiff has a Full Scale I.Q. of 110, which places him in the "high average range of intellectual functioning."  (Id. at 238.) There was a significant difference between plaintiff's Verbal I.Q. of 119 and his Performance I.Q. of 97, however, which Dr. Lange attributed to his difficulties focusing and working under time pressure.  (Id.)  Notwithstanding this, Dr. Lange found no evidence of intellectual decline over time.  (Id. at 239, 242.) She assigned plaintiff a GAF of 35.  (Id. at 243.)

Dr. Lange found that plaintiff's "cognitive difficulties center around the lack of ability to concentrate and sustain attention coupled with significantly slowed information processing and motor functions."  (Id. at 242.)  This led her to conclude that plaintiff was unable to work as a physician, and she found it "unlikely that he will be able to be gainfully employed even in a more sedentary position."  (Id. at 243.)

10.  Martha J. Merrion, Ph.D.

In April 2009, upon request of the ALJ, plaintiff underwent a consultative psychological evaluation.  (Id. at 531-35.) Martha J. Merrion, Ph.D., a licensed clinical psychologist, performed the evaluation and completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) ("Mental Medical Source Statement").  (Id. at 528-30, 535.)

Plaintiff related to Dr. Merrion that he did no chores or

cooking as part of his daily activities, but spent time taking care of himself and reading history books and literature.  (Id. at 532.)  He did not drive due to an inability to focus, but was able to take public transportation.  (Id. at 533.)  Plaintiff reported that he was anxious and tended to avoid people.  (Id.) He discussed the 2002 death of a close friend as a result of HIV-AIDS, and related that this had been a traumatic event in his life.  (Id.)  Dr. Merrion found him to be cooperative but with a sad affect and attitude.  (Id.)

Dr. Merrion diagnosed plaintiff with generalized anxiety disorder and an undifferentiated somatoform disorder[4].  (Id. at 534.)  In the Mental Medical Source Statement, Dr. Merrion found a mild limitation on plaintiff's ability to understand, remember, and carry out simple instructions, as well as his ability to make judgments on simple work-related decisions. (Id. at 528.)  She found a moderate limitation on his ability to understand, remember, and carry out complex instructions.  (Id.)

Dr. Merrion recommended intensive psychotherapy, but suggested that individuals with somatoform disorders are generally not good candidates for such treatment.  (Id. at 534.) She felt that plaintiff was "cognitively capable of doing simple

---

[4] A somatoform disorder is described as "physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."  20 C.F.R. Part 404, Subpart P, Appendix 1, 12.07.

and repetitive tasks consistently well" but that his anxiety and lack of focus would impair his ability to maintain "competitive employment."  (Id.)

11.  Vincent Lawson, M.D.

The ALJ also requested that plaintiff undergo an additional medical evaluation.  Dr. Vincent Lawson examined plaintiff in April 2009 and completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) ("Physical Medical Source Statement").  (Id. at 536-48.)

Dr. Lawson found that, though plaintiff's affect was flat, he was able to lift and carry light objects, and was able to squat and stand up with ease.  (Id. at 539, 547.)  Plaintiff's range of motion was normal for all areas except for his back, where he had recently sustained a back injury.  (Id. at 539.) Dr. Lawson concluded that plaintiff "can be expected to sit, stand and walk normally in an 8 hour workday with normal breaks" and that he "can be expected to carry 10 pounds frequently and 20 pounds occasionally."  (Id. at 539-40.)

C.  **Hearings Before ALJ Sturek**

1.  December 17, 2008 Hearing

a)  *Plaintiff's Testimony*

At the initial hearing, plaintiff testified to the following facts.  At the time of the hearing he was 47 years old, had completed a Bachelor's degree, a Master's degree, and

15

an M.D.  (Id. at 62-64.)  Plaintiff further testified that he
had never married and had no children.  (Id. at 62.)  At the
time of the hearing, he was living with his parents in Virginia,
and he had previously been living with a friend in New York.
(Id. at 62.)

Plaintiff testified that he had a driver's license and
typically drove two to three times per month within a short
distance of his parents' house.  (Id. at 64.)  He was board
certified in internal medicine until 2003, when he failed to
recertify.  (Id. at 65.)  He had been licensed to practice
medicine in the states of California, Florida, and New York, but
at the time of the hearing those licenses were either suspended
or lapsed.  (Id. at 66.)

Plaintiff alleged that the onset of his chronic fatigue
began in April 2003, at which time he stopped working.  (Id. at
61, 67.)  His decision to stop working was made after consulting
a Dr. Call, a psychiatrist who did not keep any medical records.
(Id. at 67-68.)  In August 2003, plaintiff began receiving long-
term disability benefits of $5,200 a month from his private
insurer.  (Id. at 68-69.)  He had health insurance through his
domestic partner.  (Id. at 69.)

Plaintiff testified to the following information.  In 2003,
when he was first diagnosed with CFS, he could lift ten pounds
for short periods of time.  (Id. at 76.)  He related that

16

exercise and walking for fifteen minutes or more would leave him fatigued for twenty-four hours or longer. (Id.) He had trouble sitting for long periods of time. (Id.) He could write, but his hands were not strong. (Id. at 77.) He could drive short distances during the day, and had no trouble using the gas pedal or the brake. (Id.) He had trouble getting restful sleep, and slept four to six hours at a time, two or three times a day. (Id. at 77-78.) He read books, but had trouble retaining information. (Id. at 78.) He testified that he was able to bathe and dress himself. (Id. at 79.) At the time of the hearing, plaintiff reported that Dr. Levine, his treating physician, currently had no treatments for him. (Id. at 79-80.)

**b)** ***Vocational Expert's Testimony***

Dr. James Ryan, an impartial vocational expert ("VE"), also testified at the initial hearing before ALJ Sturek in December 2008. His testimony revealed the following information.

Plaintiff's past relevant work as a physician was at the light exertion level and skilled. (Id. at 71.) The primary skill was that of "medical knowledge, the ability to diagnose and treat." (Id. at 72.)

The ALJ asked the VE to consider a hypothetical worker of plaintiff's age, education, and vocational background. (Id. at 80-86.) The ALJ asked the VE to list light and sedentary jobs that would be limited by the following factors:

17

(1)   The ability to lift no more than 10 pounds frequently, no more than 20 pounds on occasion;

(2)   The ability to walk or stand at least two hours out of an eight hour day, for perhaps 10 to 15 minutes at a time;

(3)   The ability to sit for up to six hours out of an eight hour day;

(4)   Only occasional performance of postural activities, including climbing, balancing, bending, stooping, kneeling, crouching, and squatting;

(5)   The need to avoid concentrated exposure to hazards such as moving machinery or unprotected heights; and

(6)   A moderate[5] limitation in the ability to concentrate, to maintain attention for extended periods, to keep up with pace, to respond appropriately to changes in the work setting and to set realistic goals and make plans independently of others

In response, the VE testified that the limitations listed in the first hypothetical factor would result in the following possible jobs for plaintiff:

(1)   Light, Unskilled Occupational Base

        a.   Machine Tender, with 38,000 positions

---

[5] The ALJ defined moderate as "meaning as to an individual activity there's more than a slight limitation, but that the individual is still able to function satisfactorily with respect to it." (Id. at 82.)

18

nationally and 350 positions locally; and

    b.   Packer and Packaging Worker, with 41,000

positions nationally and 400 positions locally.

(2) Sedentary, Unskilled Occupational Base

    a.   Inspector, with 36,000 jobs nationally and 200

locally; and

    b.   Table Worker, with 40,000 jobs nationally and

300 locally.

(Id. at 82-83.)

The ALJ asked the VE to consider a second hypothetical

question based on Dr. Levine's May 21, 2007 letter. (Id. at

468.)  He asked him to consider a claimant who

> experiences profound exhaustion which lasts up to 24 hours
> a day which is unrelieved by rest period, low-grade fever,
> sore throat, muscle and joint pain, short-term memory loss
> and difficulty concentrating.  As a result of his profound
> weakness and fatigue he is unable to perform even simple
> household chores, which involve walking more than 10
> minutes without stopping to rest, climbing more than a
> flight of stairs at a time without stopping to rest or five
> minutes … lifting or carrying objects weighing more than 10
> pounds no more than 30 feet and carrying on a conversation
> or reading or writing for more than 15 minutes
> uninterrupted with a prognosis considered poor.

(Id. at 85, 468.)  The VE opined that there was no work at any

exertional level which a claimant with those limitations could

perform.  (Id. at 85.)

When asked to give plaintiff's testimony full credibility,

with the assumption that his testimony was supported by the

medical record, the VE opined that plaintiff was incapable of working on a full-time, sustained basis.  (Id. at 85.)  The VE felt that plaintiff's sleep schedule of sleeping four to six hours at a time, two to three times in the course of a day, would cause absenteeism or lateness at an unacceptable rate and would render plaintiff unemployable.  (Id. at 86.)

2.  Supplemental Hearing

Following the initial hearing, the ALJ solicited the consultative examinations of Drs. Merrion and Lawson.  See supra pp. 13-15.  Upon receiving their reports and plaintiff's response to their findings, as well as additional medical records, the ALJ held a supplemental hearing on July 17, 2009 in Washington, D.C.  VE Ryan testified at this hearing.

a)  *Vocational Expert's Testimony*

The ALJ asked the VE to consider a hypothetical worker of plaintiff's age, education, and vocational background (Id. at 34-44.)  In his hypothetical, the ALJ asked the VE to list jobs that would be limited by the following limitations:

(1)  Exertional limitations which would permit a full range of sedentary work but less than a full range of heavy, medium and light work;

(2)   No postural limitations, no manipulative limitations, no environmental limitations;

(3)   Mild[6] limitations on the ability to understand, remember, and carry out simple instructions, as well as making judgments on those instructions;

(4)   Mild limitations on the ability to interact appropriately with the public, with supervisors, coworkers, and to respond appropriately to usual work situations; and

(5)   Moderate limitations on the ability to understand, remember, and carry out complex instructions, as well as making judgments on those instructions.

(Id. at 34-35.)   The VE testified that such a claimant would not be able to perform plaintiff's past relevant work.  (Id. at 35.) He also stated that such a claimant with plaintiff's transferrable skills would not be able to perform any light or sedentary skilled or semi-skilled jobs.  (Id. at 38.)  The VE then testified that the hypothetical claimant could perform the following jobs:

(1)   Heavy, Unskilled Occupational Base

      a.   Construction Laborer, with 96,000 positions nationally and 1,500 positions locally.

(2)   Medium, Unskilled Occupational Base

---

[6] The ALJ defined mild as "a slight limitation but that the individual can generally function well."  (R. 35.)

     a.   Machine Tender, with 89,000 positions
         nationally and 980 positions locally.

(3)  Light, Unskilled Occupational Base

     a.   Packer and Packaging Worker, with 68,000 jobs
         nationally and 800 locally.

(4)  Sedentary, Unskilled Occupational Base

     a.   Inspector, with 56,000 jobs nationally and 950
         locally.

(Id. at 36-38.)

### III. APPLICABLE LAW

To be found disabled, a claimant must have:

> an inability to do any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or can
> be expected to last for a continuous period of not less
> than twelve months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).

Defendant's regulations require an ALJ to evaluate a
person's claim for disability insurance benefits under a five-
step sequential process (the "process"). Reichenbach v. Heckler,
808 F.2d 309, 311 (4th Cir. 1985); 20 C.F.R. § 404.1520(a).  The
process requires defendant to consider whether a claimant: (1)
is currently engaged in substantial gainful activity[7]; (2) has a

_____

[7] Substantial gainful activity ("SGA") is defined as work
activity that involves doing significant mental or physical
activities and work that is usually done for pay or profit,
whether or not a profit is realized.  (20 C.F.R. § 404.1572(a)-

medically determinable impairment that is "severe"[8] or a combination of impairments that is "severe"; (3) has an impairment that meets or equals the requirements of a "listed" impairment[9]; (4) has the residual functional capacity[10] to return

---

[8] (b); R. 12.) If an individual engages in SGA, she is not disabled regardless of who severe her physical or mental impairments are and regardless of her age, education and work experience. (Id.) If the individual is not engaging in SGA, the analysis proceeds to the second step. (Id.)

[8] An impairment or combination of impairments is "severe" within the meaning of defendant's regulations if the impairment significantly limits an individual's ability to perform basic work activities. (Id.) An impairment is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the individual's ability to work. (Id.; 20 C.F.R. § 404.1521.) If the individual does not have a severe medically determinable impairment, she is not disabled, but if she does have a severe impairment, the analysis proceeds to the third step. (R. 12.)

[9] A "listed" impairment is one that exists in the list and produces the associated symptoms contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant can satisfy step three by showing that she has a listed impairment or that she has more than one impairment that, when combined, result in symptoms of equal severity and duration as a listed impairment. 20 C.F.R. § 404.1523. If the individual's impairment or combination of impairments meets or equals the criteria of a listing and meets the duration requirement outlined in 20 C.F.R. § 404.1509, the claimant is disabled. (R. 13.) If the impairment does not meet or equal the criteria, the analysis proceeds to the next step. (Id.)

[10] As part of step four, the ALJ must determine the claimant's residual function capacity ("RFC") as outlined in 20 C.F.R. § 404.1509. An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. (R. 13.) In determining the RFC, the ALJ must consider all of the individual's impairments, including impairments that are not severe. (Id.; 20 C.F.R. §§

23

to his past work[11]; and (5) if not, whether he can perform other

work in the national economy[12]. (R. 12-13.)   Though the claimant

bears the burden of proving disability, a limited burden shifts

to the defendant in the last step. (Id. at 13.)   In order to

support a finding that the individual is not disabled, the

defendant must provide evidence that other work exists in

significant numbers in the national economy that plaintiff can

do, given plaintiff's RFC, age, education and work experience.[13]

20 C.F.R. §§ 404.1512(g), 404.1560(c).

---

404.1520(e), 404.1545.)

[11] Past relevant work is worked performed, either as the claimant
actually performed it or as it is generally performed in the
national economy, within the last 15 years or 15 years prior to
the date that disability must be established.  (R. 13.)   The
past relevant work must have lasted long enough for the
individual to have learned to do the job and have been SGA.
(Id.; 20 C.F.R. §§ 404.1560(b), 404.1565.)   If the plaintiff has
the RFC to do her past relevant work, she is not disabled, but
if she is unable to do any past relevant work, the analysis
proceeds to the next step.  (R. 13.)

[12] In making this last determination, the ALJ must take the
individual's age, RFC, education and work experience into
account.  (R. 13.)   If the individual is able to do other work,
she is not disabled.  (Id.)   If the individual is not able to do
other work and meets the duration requirement, she is disabled.
(Id.)

[13] Defendant may meet the burden of showing other jobs through
use of the Medical-Vocational Guidelines of the regulations or
through the testimony of a vocational expert.  20 C.F.R. Part
404, Subpart P, Appendix 2.  Where plaintiff's RFC is affected
by factors which may not be reflected in the criteria of the
Medical-Vocational Guidelines, the ALJ may need to obtain
evidence from a VE to ascertain specific jobs which would
accommodate the individual's RFC.

IV.   STANDARD OF REVIEW

This Court may not review defendant's decision *de novo,* but instead must determine whether defendant's decision is supported by substantial evidence in the record and whether defendant applied the correct law.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance.  Hays, 907 F.2d at 1456.  In reviewing for substantial evidence, the Court does not weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ. The correct law to be applied includes the Act, its implementing regulations, and controlling case law.  See Coffman, 829 F.2d at 517-18.  With this standard in mind, the Court next evaluates the ALJ's findings and decision.

V.   ALJ'S FINDINGS AND DECISION

In this case, the ALJ made the following findings. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009. (R. 14, Finding 1.)  He had not engaged in substantial gainful activity since April 27, 2003.  (Id., Finding 2.)  Through the date last insured, plaintiff had the following severe impairments under 20 C.F.R. §

25

404.1520(c): CFS, a depressive disorder, a generalized anxiety disorder, a somatoform disorder, a cognitive disorder manifested by memory loss, and sleep apnea.  (Id., Finding 3.)  However, these impairments did not meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1525, 404.1526.  The lack of pre-morbid testing left the ALJ with no basis to judge whether plaintiff had a loss of measured intellectual ability of at least 15 I.Q. points as required by Listing Section 1202A7.  (R. 14.)  Plaintiff also failed to meet the Paragraph B criteria for all listings.  (Id. at 14-15.)

The ALJ determined that plaintiff has the following functional limitations.

> He has the ability to frequently lift up to 10 pounds, and to occasionally lift up to 20 pounds.  He can sit for up to six hours in an eight-hour workday.  He can stand and/or walk for at least two hours in an eight-hour workday, but only for 10 to 15 minutes at a time.  He can perform postural movement on an occasional basis, including climbing, balancing, bending or stooping, kneeling, crouching or squatting, and crawling.  Due to occasional balance problems and possible side effects of medication, he has to avoid concentrated exposure to hazards, including moving machinery and unprotected heights.  As a result of a combination of fatigue, possible side effects of medication, and mental problems, he is moderately limited in his abilities to concentrate, to maintain attention for extended periods, to keep up with pace, to respond appropriately to changes in the work setting, to set realistic goals or make plans independently of others.

(Id. at 16.)  Thus, the ALJ concluded that plaintiff has the RFC to perform a range of light and sedentary work.  (Id.) Plaintiff was unable to perform any past relevant work through

the date last insured.  (Id. at 23, Finding 6.)

Plaintiff was born on July 10, 1961 and was 41 years old on the alleged disability onset date.  (Id. at 24, Finding 7.)  He subsequently changed age category to a "younger individual age 45-49."[14]  (Id.)  Plaintiff has at least a high school education and is able to communicate in English.  (Id. at 24, Finding 8.) The transferability of plaintiff's job skills was not material to the ALJ's determination of disability because the Medical Vocational Rules supported a finding that plaintiff was not disabled, regardless of his transferrable jobs skills.  (Id., Finding 9.)  Considering the testimony of the VE, plaintiff's age, education, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that plaintiff can perform and that plaintiff was capable of making a successful adjustment to those jobs.  (Id. at 24-25, Finding 10.)  Thus, plaintiff was found not to be under a disability at any time through the date last insured under 20 C.F.R. § 404.1520(g).  (Id. at 25, Finding 11.)

## A.   The ALJ's Findings Are Supported by Substantial Evidence

Plaintiff first argues in his Motion for Summary Judgment that the ALJ's decision was not based upon substantial evidence because the ALJ failed to properly apply Social Security Ruling

---

[14] Though he is now, at age 50, considered a "person closely approaching advanced age."  20 C.F.R. § 404.1563(d).

("SSR") 99-2p.  (Pl's Mem. Supp. Mot. Summ. J. 20-22.)  He
asserts that those medical opinions relied on by the ALJ that
did not discuss plaintiff's CFS should not be considered
substantial evidence.  (Id. at 21-22.)  Plaintiff specifically
discounts the evaluations of Drs. Cohn, Elion, Fischer, Merrion,
and Lawson.  (Id.)

1.   Social Security Ruling 99-2p

SSR 99-2p clarifies the Social Security Administration's
policies for evaluating claims for disability based on CFS.  SSR
99-2p.  This process mirrors the five-step process used for
evaluation of claims for disability benefits.

Although CFS may be diagnosed based on a patient's claims
alone, the Act requires medical signs or laboratory findings
before a medically determinable impairment may be established.
Id.  If such an impairment is established, SSR 99-2p dictates
that the adjudicator evaluate the severity of the symptoms.  Id.
(Step 2).  Upon determining that the impairment is severe, the
adjudicator must then determine whether the claimant's CFS meets
one of the listed impairments contained in Appendix 1, Subpart P
of 20 C.F.R. Part 404.  Id. (Step 3).  "[I]n cases in which
individuals with CFS have psychological manifestations related
to CFS, consideration should always be given to whether the
impairment meets or equals the severity of any impairment in the
mental disorders listings in 20 C.F.R., part 404, subpart P,

28

appendix 1, sections 12.00 ff." Id. Regardless of the
adjudicator's findings at the third step, he must evaluate the
claimant's RFC and proceed to the fourth (and possibly fifth)
steps in the evaluation process. Id.

2.   ALJ's Application of Social Security Rule 99-2p

Plaintiff argues that the ALJ failed to evaluate whether
plaintiff's CFS "'could reasonably be expected to produce the
individual symptoms associated with CFS.'" (Pl's Mem. Supp.
Mot. Summ. J. 20-21.) Because some of the medical reports
relied on by the ALJ did not specifically discuss CFS, plaintiff
argues that those reports should not be considered substantial
evidence.

**a)   *Steps One through Three***

The ALJ first noted that plaintiff had not engaged in
substantial employment since the date of the alleged onset of
disability. (R. 14.) He then determined that plaintiff's CFS
constituted a severe impairment. (Id.)

Then, as required by SSR 99-2p, the ALJ consulted the
mental disorder listings in 20 C.F.R. Part 404, Subpart P,
Appendix 1, Section 12.00 et seq. to determine whether
plaintiff's CFS "is of the severity contemplated by the Listing
of Impairments." SSR 99-2p. In addition to meeting the
paragraph A criteria, which vary for each listing, a claimant
must also be markedly impaired in at least two of the four

criteria set out in paragraph B.[15]  Or, alternatively, plaintiff

must satisfy the criteria set out in paragraph C.  The ALJ

properly considered whether plaintiff met Listings 12.02

(organic mental disorders), 12.04 (affective disorders), 12.06

(anxiety related disorders), and 12.07 (somatoform disorders).

(R. 14-16.)  In each case, he found that plaintiff's CFS did not

equal the severity required by the Listings.  (Id.)

    The ALJ found that plaintiff did not meet the Paragraph A

requirements of Listing 12.02, which requires, in relevant part,

that a claimant demonstrate a "[l]oss of measured intellectual

ability of at least 15 I.Q. points from premorbid levels or

overall impairment index clearly within the severely impaired

range on neuropsychological testing."  20 C.F.R., part 404,

subpart P, appendix 1, § 12.02(A)(7).  Dr. Lange's July 2006

testing revealed that plaintiff has an average I.Q. of 110, with

a Verbal I.Q. of 119 and a Performance I.Q. of 97.  (R. 238.)

Although noting the 22-point difference between his Verbal and

Performance I.Q.s, the ALJ found that, without pre-morbid

---

[15] The Paragraph B criteria are:

  1. Marked restriction of activities of daily living; or
  2. Marked difficulties in maintaining social functioning; or
  3. Marked difficulties in maintaining concentration,
     persistence, or pace; or
  4. Repeated episodes of decompensation, each of extended
     duration.

20 C.F.R., part 404, subpart P, appendix 1.

testing, plaintiff could not establish that he had suffered the loss of functioning required by 12.02(A)(7).  (Id. at 14.)

The ALJ also found that plaintiff's impairments, "considered singly and in combination," did not meet the Paragraph B criteria of Listings 12.02, 12.04, 12.06, and 12.07. (Id. at 14-15.)

The ALJ found that plaintiff had only a moderate restriction in activities of daily living.  (Id. at 15.)  He specifically noted plaintiff's CFS impairment as responsible for plaintiff's limitations in this area.  (Id.)  In making this determination, the ALJ pointed to plaintiff's reported activities of reading, watching television, surfing the internet, showering, going out for two to three hours, and travelling between Virginia and New York.  (Id.)  He also relied on plaintiff's own testimony that he took care of his personal needs.

The ALJ found that plaintiff had moderate limitations in both social functioning and in concentration, persistence, or pace.  (Id.)  He relied on the report of Dr. Cohn, which indicated that plaintiff concentrated well during his medical examination, as well as the records of Dr. Levine, who noted that claimant had only mild to moderate anxiety.  (Id. at 15.) The ALJ specifically stated that the record in its entirety did not support a finding of marked limitations in social

31

functioning and concentration.  (Id. at 15.)

Finally, the ALJ found that plaintiff had only experienced one or two episodes of decompensation of extended duration, and therefore did not satisfy the final Paragraph B criterion, which requires "repeated" episodes.  (Id.)

### b)  *Step Four*

The ALJ then properly proceeded to Step 4 of the process and evaluated plaintiff's residual functional capacity.  (Id. at 16-23.)  The ALJ determined that plaintiff had an RFC to perform a range of light and sedentary work and that he could not return to his past relevant work as an internist.  (Id.)  The ALJ found that plaintiff could perform various postural movements, frequently lift up to ten pounds, sit for up to six hours in an eight-hour workday, and stand or walk for at least two hours in an eight-hour workday for only 10 to 15 minutes at a time.  (Id. at 16.)  Because of balance problems and possible side effects of medication, the ALJ found that plaintiff needed to avoid concentrated exposure to hazards.  (Id.)  Due to fatigue, mental problems, and possible side effects of medication, the ALJ found that plaintiff was moderately limited in his ability to concentrate, to maintain attention for long periods of time, to respond to changes in the work setting, and to set realistic goals.  (Id.)

In making these findings, the ALJ determined that

plaintiff's statements concerning the severity of his symptoms were not credible in light of the total medical record.  (Id. at 19.)  He afforded considerable weight to the determinations made by Drs. Merrion and Lawson, the consultative mental and physical examiners in April 2009.  (Id. at 23.)  Conversely, he did not assign controlling weight to the opinions of plaintiff's treating physicians – Drs. Schmidt, Levine, and Krueger.  (Id.) Instead, he found that their opinions were not substantiated by their clinical findings or treatment notes, the other medical evidence in the record, and the ALJ's own observations of plaintiff at the hearings.  (Id.)  In doing so, he specifically noted that he considered SSR 99-2p regarding CFS.  (Id.)

### c)   *Step Five*

The ALJ concluded his analysis by determining, with the assistance of a vocational expert, that alternative work existed in the national economy that plaintiff can perform.  (Id. at 24-25.)  Among the jobs available to someone with plaintiff's RFC were machine tender (light), packer and packaging worker, inspector (sedentary), and table worker (sedentary).  (Id.) Accordingly, the ALJ ruled that plaintiff was not disabled within the framework of the Act.

### 3.   Evaluation

The undersigned finds that the ALJ followed SSR 99-2p and that his findings are supported by substantial evidence.  The

ALJ properly followed each step in the process as dictated by 20 C.F.R. §§ 404.1520(a) and SSR 99-2p.

While plaintiff may disagree with the level of severity that the ALJ attributed to his CFS, it is inaccurate to state that the ALJ did not consider those symptoms at all.  Indeed, the Court notes that the ALJ not only found that plaintiff's CFS was a severe impairment, but he also specifically considered CFS on multiple occasions when evaluating plaintiff's claim.  (Id. at 15, 19, 22-23.)  He also relied on Dr. Levine's notes to support certain findings, although he did not assign them controlling weight.  Additionally, Dr. Cohn, who did not specifically mention CFS, was aware of plaintiff's CFS diagnosis and had reviewed plaintiff's medical records.  (Id. at 481.)

Plaintiff cites no law supporting his assertion that, because an examining physician or clinician did not mention CFS, his opinion should not be considered substantial evidence. Defendant correctly notes that a diagnosis of CFS does not automatically entitled plaintiff to disability benefits. Rather, SSR 99-2p gives the ALJ – and not the examining physician, as plaintiff seems to argue – guidelines for determining the presence and evaluating the severity of an individual claimant's CFS.  As set forth below, defendant had ample evidence on which to rest its conclusion.

Dr. Cohn's 2006 assessment is substantial evidence

34

supporting the ALJ's decision.  Dr. Cohn's examination revealed that plaintiff had normal strength and power, that his gastrointestinal complaints were manageable, and that he concentrated and focused very well during the visit.  (Id. at 19, 481-83.)  Significantly, Dr. Cohn noted that plaintiff's activities included travelling from Virginia to New York, taking the subway, and walking.  (Id. at 19, 482.)  The ALJ was justified in finding that these activities and findings were inconsistent with disabling fatigue.  (Id. at 19.)

Dr. Lawson's 2009 consultative examination also provides substantial evidence to support the ALJ's decision.  That exam revealed that plaintiff's abdomen was non-distended, his extremities were normal, his hand-eye coordination was good, and that his reflexes were symmetric.  (Id. at 22.)  Dr. Lawson noted that plaintiff, though "flat in affect," was alert and oriented, made good eye contact, and had clear thought processes.  (Id.)

Dr. Merrion's 2009 consultative examination is also substantial evidence supporting the ALJ's decision.  Dr. Merrion reported that plaintiff took care of himself and spent time reading history books and novels.  He was capable of doing his own laundry, handling his own money, and taking public transportation.  She also reported that plaintiff was able to perform simple, repetitive tasks consistently well.  She found

35

that his anxiety, depression, fatigue, and general lack of focus would only mildly to moderately impair his ability to deal with competitive employment.

The ALJ also considered the plaintiff's own testimony at the hearing and found it to be inconsistent with the medical evidence of the record.  Plaintiff testified at the December 2008 hearing that he weighed 215 pounds, and that he had gained 15 pounds since 2003 due to inactivity.  (Id. at 62.)  The medical record showed, however, that plaintiff weighed 223 pounds in November 2003 and 210-215 pounds in March 2006.  (Id. at 19.)  The ALJ found this testimony to be inconsistent and the alleged weight gain to be not disabling.  (Id.)

The ALJ also relied on his own observations of plaintiff at the hearing.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).  The ALJ's own observations of plaintiff "were not suggestive of a person who is experiencing disabling limitations."  (Id. at 22.)  The ALJ observed that plaintiff moved easily in and out of the hearing room, and answered questions clearly and thoroughly during a lengthy hearing. (Id.)  Given the importance of the ALJ's personal observations, the Court gives them due weight in reviewing whether the

36

defendant's conclusion is based on substantial evidence.

Plaintiff's activities of daily living also factored into the ALJ's decision.  Although plaintiff did not perform chores or cook while living at his parents' house, he testified that he bathed and dressed himself.  (Id. at 79.)  He also read history books and novels, surfed the internet, watched television handled his own money, and used public transportation.  (Id. at 22, 532-33.)  He travelled frequently between Virginia and New York, where he was able to take the subway and walk around. (Id. at 482.)  Plaintiff was able to write and use his hands, although he testified that he was "inclined to drop things." (Id. at 77.)

This Court's role is not to weigh conflicting evidence or substitute its judgment for that of the ALJ.  Considering the opinions of multiple medical sources, plaintiff's activities, and the ALJ's own observations, the Court concludes that substantial evidence exists in the record to support defendant's conclusion.

**B.   The ALJ Applied the Correct Legal Standard**

Plaintiff next argues that the ALJ applied erroneous legal standards in two respects: first, when concluding that plaintiff did not meet or equal the criteria of listing 12.02; and second, when weighing the different medical opinions of plaintiff's treating and consulting physicians.  (Pl's Mem. Supp. Mot. J.

Pleadings 22-25.)

1.   <u>Listing 12.02</u>

Plaintiff disputes the ALJ's finding that, because plaintiff lacked premorbid testing, he could not satisfy the Paragraph A criteria for Listing 12.02.

Paragraph A requires, in relevant part, the demonstration of "loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing."  20 C.F.R., part 404, subpart P, appendix 1, § 12.02(A)(7); <u>see</u> <u>supra</u> p. 30.  Plaintiff argues that 12.02 does not require actual premorbid *testing* to prove that a claimant meets the listing, but rather a demonstration that the claimant's level of intellectual ability has decreased.  (Pl's Mem. Supp. Mot. J. Pleadings 22-23.)  Plaintiff cites no case supporting this interpretation of 12.02, nor could the Court find one.  Instead, plaintiff argues that Dr. Lange's testing estimated plaintiff's premorbid I.Q. to be lower than his current I.Q., and that this should satisfy 12.02A.  (<u>Id.</u> at 23.)

Regardless of whether plaintiff or the ALJ are correct in interpreting 12.02, this Court finds that plaintiff has not met the burden of demonstrating a loss of premorbid I.Q. of at least 15 points.  Apparently misreading her assessment, plaintiff asserts that Dr. Lange estimated a lower premorbid I.Q. based on

plaintiff's low performance score of 97 when compared to his high verbal score of 119.  (Id.)  On close review, however, it appears that Dr. Lange did not do this.  Dr. Lange never provided a concrete pre-morbid estimate of I.Q., but instead stated that "[p]remorbid estimates of intellectual functioning … *were generally consistent with current estimates of overall intellectual function.  Thus, there was no evidence for intellectual decline over time.*"  (R. 242 (emphasis added).) Although she did note that plaintiff's depression was likely responsible for his low performance scores, this is not the same thing as a loss of intellectual ability of 15 I.Q. points as required by Section 12.02.  Accordingly, even if plaintiff's reading of 12.02 were correct – a question this Court does not reach – the Court finds that plaintiff has failed to demonstrate the requisite loss of functioning.

Further rendering plaintiff's argument moot is the fact that substantial evidence supports the ALJ's decision that plaintiff did not satisfy the Paragraph B criteria, which is required in addition to the Paragraph A criteria.  See supra pp. 30-32.  Thus, even if plaintiff could prove that the Paragraph A criteria were satisfied, plaintiff still fails to meet the 12.02 listing by virtue of the Paragraph B criteria.

2.   Weight Assigned to Various Medical Opinions

Plaintiff next argues that the ALJ erred in assigning

lesser weight to the opinions of plaintiff's treating physicians, and instead assigning greater weight to the opinions of consultative physicians and examiners.  Plaintiff seems to assert that, because each treating physician declared plaintiff to be totally disabled, that finding should be deemed conclusive.  (Pl's Mem. Supp. Mot. J. Pleadings 23-25.)

A treating source's opinion is given controlling weight if the opinion is "well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record.  20 C.F.R. § 1527(d)(2).  Thus, a court is not *required* to give a treating physician's testimony controlling weight.  Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992).  Indeed, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

Additionally, certain issues are reserved for the Commissioner of the Social Security Administration and opinions about those issues are not considered dispositive.  20 C.F.R. 404.1527(e).  A medical source's opinion that a claimant is disabled will not be given any "special significance."  20 C.F.R. 404.1527(e)(1)-(3).

In this case, the ALJ considered the opinions of Drs.

Levine, Schmidt, and Krueger and found them to be inconsistent with other evidence from the record.  As described above, substantial evidence exists in the record to support defendant's finding that plaintiff was able to do some work with jobs available in the national economy.  See supra pp. 33-37.  Because the opinions of plaintiff's treating physicians are inconsistent with that substantial evidence, the ALJ acted within his discretion in assigning them lesser weight.

Dr. Schmidt's letters of January 2004, June 2004, and August 2005 indicate that because of plaintiff's inability to concentrate or problem-solve for extended periods of time, he is completely and permanently disabled due to CFS.  (R. 19, 305-09, 289-90, 281.)  Whether plaintiff is "disabled" under the regulations is an issue reserved for the Commissioner, and the ALJ was not required to give that opinion special weight.  Indeed, the ALJ found that this conclusion was not substantiated by the totality of the record.  Plaintiff himself admitted that Dr. Schmidt was not a specialist in CFS.  (Id. at 74.)  Dr. Schmidt's assessments were based, in large part, on plaintiff's subjective complaints.  (Id. at 19.)  Further, plaintiff saw Dr. Schmidt relatively infrequently, and the care prescribed was largely conservative for treatment of a permanent and total disability.  (Id. at 19.)

Similarly, the ALJ was justified in assigning lesser weight

41

to the opinion of Dr. Levine because it was inconsistent with
other substantial evidence in the record and with her own
treatment notes.  While opining that plaintiff was totally
disabled, Dr. Levine's notes indicate that plaintiff was able to
stand and walk for fifteen minutes at a time in February 2007
and for half an hour at a time in April 2007.  (Id. at 451,
453.)  Plaintiff was using a treadmill and doing graded
exercises, though not on a regular basis, and was able to climb
stairs.  (Id. at 452, 472.)  She characterized his anxiety as
only mild to moderate at times, and as usually caused by face-
to-face encounters.  (Id. at 477.)  Again, the issue of
disability is reserved for the Commissioner and accordingly Dr.
Levine's conclusion on that matter is not dispositive.  Given
the inconsistencies in Dr. Levine's treatment notes, the
conflicting opinions of consultative medical sources, and
plaintiff's activities and observed demeanor, the ALJ was
justified in assigning lesser weight to Dr. Levine's opinion.

The ALJ also assigned limited evidentiary weight to Dr.
Krueger's opinion that plaintiff was unable to return to gainful
employment.  (Id. at 21.)  Plaintiff saw Dr. Krueger on a
relatively infrequent basis and often communicated by telephone.
(Id. at 445-49.)  Dr. Krueger's treatment notes, though
indicating that plaintiff experienced depression, do not reveal
disabling mental limitations.  (Id. at 21.)  For example, the

treatment notes show that plaintiff was "calm, clear, and without delusions," "stable," and "continue[d] to do well in all respects."  (Id. at 448.)  Dr. Krueger suggested that plaintiff's "problem is really settling down in one place to develop a coherent treatment."  (Id.)  Dr. Krueger's notes also reveal that plaintiff was "unwilling to engage in psychotherapy."  (Id.)  These notes, combined with plaintiff's infrequent and conservative course of treatment and activities of daily living, support the ALJ's conclusion that plaintiff's impairment was not totally disabling.  (Id. at 21.)

The ALJ also assigned little weight to the opinion of Dr. Lange.  Dr. Lange's neuropsychological testing in 2007 revealed that plaintiff functioned at "an overall high average intellectual level" and that he easily comprehended and organized abstract concepts and principles.  (Id. at 20, 238.) Her assessed GAF of 35 was based entirely on plaintiff's subjective complaints and was inconsistent with his treatment and daily activities.  (Id. at 21.)  The ALJ found it noteworthy that plaintiff "apparently underwent the examination not in an attempt to seek treatment for any symptoms, but rather through attorney referral, in connection with an effort to generate evidence for this claim for disability."  (Id. at 23, n.4.) The ALJ was thus justified in assigning Dr. Lange's opinion lesser weight.

43

C.     **Plaintiff Received a Full and Fair Hearing**

Plaintiff finally argues that plaintiff did not receive a full and fair hearing because the ALJ "re-engineered" the record and because the ALJ interrupted plaintiff's attorney's questioning of the VE.  (Pl's Mem. Supp. Mot. J. Pleadings 25-26.)  Arguing that ALJ Sturek is biased against plaintiff, plaintiff requests that this Court remand his case to a different ALJ for further proceedings.  (Id. at 26.)  The undersigned finds that the ALJ acted within his authority by supplementing the record, and that in no way did the ALJ's interruptions of plaintiff's attorney undermine plaintiff's hearing.

1.   Supplementation of the Record

Plaintiff argues that the ALJ's supplementation of the record after the first hearing, coupled with his refusal to subpoena Dr. Cohn, demonstrates bias against plaintiff.  (Id.; Pl's Reply at 1.)  An ALJ "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986)(citing Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981)).  An ALJ may continue a hearing to a later date in order to collect additional material evidence.  20 C.F.R. § 404.944.  Where a

44

conflict or ambiguity exists, an ALJ may order additional consultative examinations to assist in the adjudication of a claim.  20 C.F.R. § 404.1519a.

In this case, the ALJ held a hearing on December 17, 2008 at which both plaintiff and the VE testified.  At that hearing, the ALJ had before him numerous conflicting medical opinions. Dr. Levine stated that plaintiff was totally disabled and unable to work due to his CFS.  (R. 468.)  Dr. Schmidt felt that plaintiff was unable to return to work as an internist.  (Id. at 290.)  Dr. Cohn, on the other hand, felt that there was "no physical reason for disability."  (Id. at 482.)  Accordingly, the ALJ ordered two additional consultative examinations by Drs. Merrion and Lawson, and also obtained records of an examination that had been conducted prior to the first hearing.  (Id. at 28.)

The ALJ was justified in supplementing the record to resolve an ambiguity that existed about the severity of plaintiff's impairments.  The information contained in Dr. Cohn's examination was inconsistent with plaintiff's complaints to his treating physicians as well as plaintiff's own testimony. Dr. Cohn reported that plaintiff was active enough to use public transportation and travel between New York and Virginia.  He also issued a finding that plaintiff had no physical reason for disability.  This is entirely inconsistent with Dr. Levine's and

45

Dr. Schmidt's reports that plaintiff was totally disabled. Under the regulations, the ALJ is authorized to order additional examinations in precisely this situation.

Plaintiff also asserts, with little supportive argument, that the ALJ's refusal to subpoena Dr. Cohn evidences bias against him. (Pl's Reply 1.) On December 3, 2008, plaintiff requested that the ALJ issue a subpoena to Dr. Cohn for the purpose of cross examination at a supplemental hearing. (R. 232.) The ALJ apparently never responded to this request. The Court finds that the ALJ's refusal to issue a subpoena was not an abuse of discretion and does not evidence bias against plaintiff.

Defendant's regulations provide that an ALJ may, on his own initiative or on request of a party, subpoena a witness "[w]hen it is reasonably necessary for a full presentation of the case." 20 C.F.R. § 404.950(d)(1). An ALJ's failure to subpoena a witness is reversed only for abuse of discretion. Taylor v. Weinberger, 528 F.2d 1153, 1156 (4th Cir. 1975) (citing United States v. Becker, 444 F.2d 510, 511 (4th Cir. 1971)).

In Taylor, the Fourth Circuit held that an ALJ abused his discretion in refusing to subpoena a witness where the witness's out-of-court statements were the sole basis for the denial of a claim for disability benefits. Id. Alternatively, other circuits have held that refusal to issue a subpoena is not an

46

abuse of discretion where a claimant makes no showing that a
medical source's reports are inaccurate, biased, or that live
testimony would add value to the proceedings.  See, e.g., Yancey
v. Apfel, 145 F.3d 106, 113 (2d Cir. 1998).

This Court finds that the ALJ's refusal to subpoena Dr.
Cohn was not an abuse of discretion.  Plaintiff's sole basis for
requesting the subpoena was that a non-examining reviewer had
relied on Dr. Cohn's reports in an earlier denial of benefits.
Dr. Cohn evaluated plaintiff in connection with plaintiff's
private insurance carrier, and was not interested in the outcome
of this proceeding.  Although the ALJ did rely on Dr. Cohn's
reports, he also based his decision on other substantial
evidence in the record.  Thus, plaintiff fails to prove that the
subpoena was necessary for the full development of the case.

2.  Questioning of VE Ryan

Similarly, plaintiff's assertion that the ALJ "repeatedly
interrupted" plaintiff's questioning of the VE is without merit.
The standard for bias is a high one: "judicial remarks during
the course of a trial that are critical or disapproving of, or
even hostile to, counsel, the parties, or their cases,
ordinarily do not support a bias or partiality challenge."
Liteky v. United States, 510 U.S. 540, 555 (1994).  A judge's
"ordinary efforts at courtroom administration," even where terse
or stern, are not the basis for a finding of bias.  Id.  The

undersigned finds that plaintiff's assertions do not approach this high burden.

The transcript of the July 2009 hearing, beginning at page 40 and continuing through page 45, shows that the ALJ instructed plaintiff's attorney to present questions to the VE using "vocational terms rather than asking a medical opinion." (R. 40.) Instead of questioning the VE about a claimant with depression and "slowed motor and mental speeds," which the VE could not consider vocationally, plaintiff's attorney was told to frame his questions in terms of well-defined limitations of pace. (Id. at 41-42.) Plaintiff's attorney then proceeded to question the VE about the impact of three limitations at mild, moderate, and marked levels of severity. (Id. at 44-45.) At the conclusion, plaintiff's attorney stated that he had no further questions for the VE and was allowed to give a closing statement. (Id. at 45.)

Plaintiff cites no specific portion of the transcript where he was unable to question the VE, nor does he cite any cases from this Circuit that would support his assertion that he was denied a fair hearing. A review of the transcript shows that plaintiff's ability to question the VE was in no way impeded by the ALJ's corrections. The Court finds that the ALJ's comments and questions do not evidence a shred of hostility or bias toward plaintiff.

48

VI.  <u>CONCLUSION</u>

For the reasons set forth, the undersigned Magistrate Judge finds ALJ's decision is supported by substantial evidence and does not contain legal error.  Therefore, the Motion for Summary Judgment by defendant, Michael J. Astrue, Commissioner of Social Security, shall be GRANTED, and the Motion for Summary Judgment by plaintiff, Kevin King, shall be DENIED.  An appropriate Order shall be issued.

_____
/s/
THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

October 24, 2011
Alexandria, Virginia